Filed 3/3/25

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JAIME B. HERREN,<br><br>    Defendant and Appellant,<br>v.<br><br>GEORGE S. et al.,<br><br>    Plaintiffs and Respondents. | A171257<br><br>(Marin County<br> Super. Ct. No. CV0002765) |

Susannah S. is the daughter, trustee, and attorney-in-fact of plaintiff George S., an octogenarian whose doctors determined in 2023 that he lacked the capacity to make financial and medical decisions.[1]  Pursuant to the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.[2]) (Elder Abuse Act), Susannah filed a petition on behalf of George for a

---

\*    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts C and D of the Discussion.

[1]    We refer to the protected person, George S., by his first name and last initial.  (Cal. Rules of Court, rule 8.90.)  So as not to defeat the objective of anonymity, we likewise refer to persons who share his last name by their first name and last initial.  For the sake of efficiency, and with no disrespect intended, after these initial references, subsequent references to these persons will be to their first names only.

[2]    All undesignated statutory references are to the Welfare and Institutions Code.

protective order against defendant Jaime B. Herren, a lawyer who had met with George alone in 2024 and secured his agreement to pay a $100,000 retainer. (§ 15657.03.) After a contested hearing, the trial court issued a restraining order prohibiting Herren from abusing and contacting George.

In the published portion of this opinion, we reject Herren's contentions that a restraining order could not be sought or issued under the Elder Abuse Act without the trial court first adjudicating George's competence. We also conclude that substantial evidence supports the finding that Herren committed financial abuse of an elder. (See §§ 15610.07, 15610.30, subd. (a)(3), 15610.70, subd. (a).) In the unpublished portion of the opinion, we reject Herren's other challenges to the elder abuse restraining order.

## Factual and Procedural Background

George and his former wife, Dalyla S., have two adult children, Susannah and Gabriella S. George was wealthy and shared that wealth with his daughters. In 1991, George created a trust which was restated in 2022. He designated Susannah, not Gabriella, as a successor co-trustee in the event of his incapacity. The trust defines incapacity to include when a "medical doctor, . . . or (in the case of the Settlor) the Settlor's treating physician, examines such person and declares under penalty of perjury that such person is either temporarily or permanently incapacitated . . . ." The trust also provides: "If any trustee or any beneficiary whose capacity is in question disputes the determination of incapacity . . . , such person may petition the court for a finding regarding that person's capacity."

Beginning in April 2021, George was in poor health, and caregivers were providing him 24/7 care. Karen Moore, a caregiver, described George at this time as very sick, anxious, depressed, not sleeping, and scared "all the time." Dr. Elizabeth Sutherland, who has a doctorate in clinical psychology

2

and is practicing as a geropsychologist, began seeing George in June 2022. Dr. Sutherland described George's mood as erratic, sad, anxious, and suicidal; he was also physically unstable, weak, and a fall risk. Dr. Sutherland diagnosed George with a neurocognitive disorder, which she referred to as dementia. Initially, his dementia was moderate.

In November 2022, George signed a durable power of attorney (DPOA) appointing Susannah as a successor attorney-in-fact. The DPOA broadly provides the attorney-in-fact with the power to prosecute legal actions involving George. George also signed a health care directive naming Susannah as his health care agent.

By early 2023, Susannah had begun managing the caregivers. Around this time, and after George contracted pneumonia, Susannah moved him from a home in San Francisco to a home in Marin County located near her. Moore thought George had improved after the move; he was healthy, happy, and less stressed and afraid. Dr. Sutherland likewise believed George's mood improved, but observed his memory had worsened. For example, he was forgetting who Dr. Sutherland was and forgot a long-time caregiver returning from vacation; he sometimes did not recall his current or prior home; and he was not oriented to the day, month, or year. In February 2023, Dr. Sutherland believed the dementia had become severe, and she wrote a letter opining that George lacked capacity to make medical and financial decisions. Contemporaneously, George's neurologist, Dr. Armen Moughamian, wrote a letter to the same effect.

On May 3, 2024, while Susannah was out of town and without her or the caregivers' prior knowledge, Gabriella allowed Herren—a trust and estate attorney—into George's home to meet with George. During that meeting, George signed a fee agreement to pay Herren's firm a $100,000

3

retainer. The same day, Herren sent a demand letter for payment to the co-trustees of George's trust, Susannah and Karie Dewan, and to Stimmel, Stimmel & Roeser, PC (hereafter "the Stimmel firm"), the law firm which prepared the 2022 restated trust.

### A. The Application for a Restraining Order

On May 8, 2024, Susannah, acting in her capacity as George's attorney-in-fact, filed a form request for an elder or dependent adult abuse restraining order pursuant to section 15657.03 (Judicial Council form EA-100), seeking protection for George pursuant to the Elder Abuse Act. As relevant here, the application sought an order prohibiting Herren from financially abusing George and disturbing his peace. The superior court case number given to the matter was CV0002765 (hereafter "case 2765").

The petition described the alleged abuse as follows. George, a wealthy 86 year old, has major neurocognitive disorder and lacks capacity. Gabriella, Gabriella's husband, and George's former wife Dalyla are unhappy with his estate plan, so Gabriella had Herren meet in secret with George, and now Herren is seeking payment of a $100,000 retainer. After the meeting, George was agitated and upset, and he experienced high blood pressure, rumination, poor sleep, diarrhea, and paranoia. His caregivers were afraid, and his chef quit. Dr. Sutherland reported the Herren incident to the county Adult Protective Services agency (APS).

Susannah filed a materially identical application for a restraining order against Gabriella. The superior court case number given to this matter was CV0002766 (hereafter "case 2766"). Pending the hearings on these matters, the court granted temporary restraining orders against Herren and Gabriella.

4

## B. Herren's Response

Herren filed a form response (Judicial Council form EA-120) in case 2765 objecting to the requested restraining order. In case 2766, Herren filed a declaration claiming Gabriella told her that George wanted to speak to an attorney. Herren averred that when she went to see George and a caregiver questioned why she was there, George said Herren was there at his invitation. Because George disagreed with the diagnosis of incompetence and his forced isolation from family, friends, and longtime counsel and medical providers, he retained Herren to explore obtaining an evaluation of his competency and explore filing a petition to determine his competency. After speaking to George, Herren was satisfied he could retain her firm.

## C. The Evidentiary Hearing

On May 24, 2024, Herren appeared as the respondent in case 2765 and indicated she was also appearing as George's counsel in the case and various related matters, including Gabriella's cross-petition in case 2766 for an order allowing contact. William Webb announced he was appearing on behalf of George and Susannah. Ultimately, the trial court continued the hearing and ordered that the temporary restraining orders remain in effect. Herren objected to the continuance of the temporary restraining orders, contending that she could speak on George's behalf, that George would disagree with the restraining order requests, and that he would agree with Gabriella's request allowing contact. Herren requested appointment of a guardian ad litem for George pursuant to Probate Code section 1003. The court denied that request without prejudice.

Though case 2765 and case 2766 were not consolidated, at the parties' request, the court took evidence in both cases. The evidentiary hearing

5

continued over numerous days in June and July 2024. The following is a summary of the testimony presented.

Dr. Sutherland, an expert in "geropsychology with a background in neuropsychological evaluations including capacity evaluations," testified as follows. She sees George about once a week and has diagnosed him with "[m]ajor neurocognitive disorder, multifactorial, Alzheimer's and Lewy body with behavioral challenges," which is a "severe dementia." George talks to her about stressors, and she has observed certain patterns, e.g., "when there is contact with [Gabriella], there is a consequence of distress around money." To maintain George's baseline, it is important to keep him in calm, low stimulation environments. Dr. Sutherland has told Gabriella that financial conversations distress George.

When Dr. Sutherland saw George in late April 2024, he was stable and in a good mood. But on May 2, 2024, he was distressed and had a hand tremor because his former wife called asking for money. This response was generally consistent with George's response on a dozen or so prior occasions when people asked him for money.

Dr. Sutherland saw George on May 4, 2024, the day after Herren met with George. George was extremely distressed, paranoid, and ruminating; he talked about feeling unsafe and being held against his will. He had never before expressed feeling locked up or like a prisoner. Pursuant to her duty as a mandatory reporter, Dr. Sutherland reported the incident involving Herren to APS. At Dr. Sutherland's recommendation, George's phone access was restricted because many calls were coming in and causing more distress. Dr. Sutherland also recommended limiting Gabriella's access to George and his calendar, though Susannah did not want to do so.

6

On May 7, 2024, upon learning Gabriella was at George's home, Dr. Sutherland called the police and proceeded to the home. When she arrived, Gabriella had already left and George appeared deflated, ruminating, and distressed. George kept stating he was "locked in" and expressed confusion about his location and his caregivers. George also said he did not want to talk about money anymore. He mentioned something about a $100,000 " 'bill for work,' " but could not remember what kind of work.

Dr. Sutherland believes that George lacks capacity to make financial and medical decisions and that Herren should be kept away from George if her goal is to have him sign contracts and ask him for money. Given the severity of his dementia, George would not seek out an attorney, nor could he communicate goals in detail. In Dr. Sutherland's view, someone meeting George should know within about five minutes that something is "amiss." Susannah has never asked Dr. Sutherland to do anything unethical, and Dr. Sutherland has no reason to suspect that Susannah has exercised undue influence over George.

Karen Moore testified as follows. She is a home health aide and certified nursing assistant, and she has been a caregiver for George for the last three and a half years. Presently, when Moore greets George, she always tells him her name because his memory is not good. George has to be reminded about "[a]lmost everything." On a daily basis, he is unable to remember that he is at his home and that he has children and was previously married. He does not know whether he has a girlfriend or if his parents are still alive. It is unsafe for George to shower alone, and Moore does not think he is capable of fully dressing himself.

George has a calendar so that his caregivers know what is happening each day. Prior to May 2024, Susannah had never told Moore that the

7

calendar could not be shown to Gabriella or that Gabriella was not allowed at the house.

On May 2, 2024, around 8:30 p.m., Moore heard George's former wife call and ask him on the speaker phone, " 'did you get that $10,000 for my air fare?' " George responded, " 'I don't know where I am. I have slept in three different places this week.' " The next day, George—who is usually is happy and smiling—appeared "flat" and scared, and said " 'I can't remember something.' "

At some point on May 3, 2024, Gabriella arrived. After leaving Gabriella and George alone, Moore eventually saw Gabriella heading to the door and Herren talking with George. Moore told Herren she was not in the calendar and could not be there. Herren claimed that George called her, set up an appointment, and knew her, but George said he did not know her. Moore and Herren bickered until Herren threatened that Moore would be " 'charged with elder abuse' " if she did not give George privacy. Then George said Moore had better leave. Moore moved to a window seat in the room, but heard George tell Herren, " 'She is still here,' " at which point Moore left the room completely. George never told Moore he wanted to meet with Herren.

The meeting lasted an hour and a half. Before leaving, Herren asked Moore for George's phone number and email. Moore provided the house number, but said Herren would have to get the rest from Susannah and said, " 'If you are his counsel, shouldn't you have this information?' " After the meeting, George looked drained, hungry, and tired, and he went to bed. When Gabriella called later and asked how the meeting went, George responded, " 'I don't know.' " After the May 3 incident, Moore told Susannah she wanted a restraining order against Gabriella. Prior to that date, Susannah had never tried to prevent George from meeting anybody.

8

Susannah testified as follows. In April 2023, she and co-trustee Karie Dewan—a professional fiduciary—informed the trust beneficiaries that George lacked capacity to make financial decisions. George has since said that Gabriella asks him about money, that this upsets him, and that he would like to not think about such things. About once a month, George has expressed not wanting to see Gabriella because she asks for money. Susannah has told Gabriella that conversations about money upset George. George asked to talk with Susannah and Gabriella about his estate, but Susannah refused for George's health and safety.

Though George is very intelligent and has good verbal skills, it becomes apparent after a few minutes of talking that he has memory loss and confuses topics of conversation. George's short-term memory is "almost gone," and he could not, for example, say what he had for breakfast. He gets confused daily about things such as where he lives and if he has grandchildren. Susannah has not heard George direct a conversation since 2018 or 2019, and has not heard him correct something in a conversation for years.

After Herren's meeting on May 3, 3024, George's doctors told Susannah that George was exhausted, fragile, and on extra medication, and he had developed high blood pressure. Caregivers told her that George was having urgent bowel movements, ruminating, and sleeping poorly. Susannah, who had been out of town, did not see George until May 8. By that time, George had calmed down, though he said he felt like something was wrong and somebody wanted something from him. When Susannah asked George if he wanted Herren's invoice paid, George replied he had never met Herren and was appalled someone would ask him for $100,000.

After consulting with Dr. Sutherland, Susannah blocked calls to and from Gabriella and Gabriella's husband and son, who had been calling

9

George repeatedly, and removed Gabriella's access to George's calendar. According to the calendar, Gabriella visited George 65 times from 2023 to the present.

Herren testified as follows. She has practiced trusts and estates law for about 12 years. She had a video call with Gabriella and understood George wanted counsel, but it was unclear what exactly he wanted or if he was competent. Gabriella told Herren there had been a conservatorship but it ended at some point. Herren did not ask and did not know if Gabriella was acting with powers of attorney, though it may have been mentioned that Susannah held the power of attorney. The only information Herren requested from Gabriella was the " 'trustee notification,' " i.e., a standard notice a trustee sends out when a trust becomes irrevocable. Gabriella provided documents to Herren, including a copy of the trust and letters indicating that George had been declared incapacitated and that Susannah was a co-trustee. Herren did not ask for any other information as she wanted to reach her own conclusions after meeting George.

Before the meeting, Herren prepared an engagement letter. When she met George, he was well groomed and wearing a house robe over clothes. Moore was upset Herren was there, but George told Moore he wanted Herren there and to speak to her privately. Herren told Moore that George invited her and asked Moore to leave because they were going to have "an attorney-client privileged conversation." Herren denied telling Moore she would be charged with elder abuse.

The meeting with George lasted about 55 minutes. George appeared to be in good health and led the conversation and seemed to have his own agenda. When asked whether George appeared oriented to "time, place, situation," Herren testified she had no "point of reference" for that, except

10

that toward the end of the meeting, he agreed with her statement that it was close to lunch. Herren believed George had the capacity to retain her and understood the consequences of the legal tasks they discussed.

George asked Herren for her fee agreement, which stated Herren's role was to represent George regarding the " 'administration of [his] trust.' " After pulling out the agreement, Herren perceived George's vision was impaired so she read him the first two pages and summarized the remaining pages, including the billing terms. George signed it, but Herren had to point to the place for his signature. George told her to get his contact information from Moore.

Invoking the attorney-client privilege at the hearing, Herren declined to discuss the agreed goal of the representation, and indicated the extent of what she could disclose was stated in her letters to the Stimmel firm. But in seeming contradiction to her earlier declaration, Herren asserted George did not authorize her to file anything having to do with his competency; rather, what George wanted was another meeting with Herren, and "the extent of [her] authority was [to] ask for the next meeting."

Gabriella testified as follows. Since February 2023, she has never asked George for money. Though she previously had visited and called George, she has only been able to see him twice after this action was filed, and both times he was happy to see her and expressed loneliness.

The trial court allowed Gabriella to testify about the following hearsay conversation she had with George, though the court indicated it would weigh the conversation accordingly. In April 2024, George told Gabriella he understood that Susannah was " 'doing all the work.' " He asked her if the work had been divided equally. When Gabriella said it had not, George was in "complete shock and disbelief." He said those were not his wishes and

11

asked for help finding counsel. Gabriella acted on this by having conversations with some legal professionals, including Herren. When George and Herren met, Gabriella heard George tell Moore that Herren would be staying.

### D. The Trial Court's Rulings

The trial court ultimately issued a restraining order against Herren. In finding that Herren engaged in elder financial abuse, the court concluded the evidence established that Herren obtained a property right from George by undue influence (§ 15610.30, subd. (a)(3)), and that she knew or should have known the taking would be harmful to George (§ 15610.30, subd. (b)). The order prohibited Herren from abusing and contacting George, and ordered her to stay 100 yards away from him and his home.

The court denied the requested restraining order against Gabriella, but admonished Gabriella of the risks of bringing people to meet with George contrary to his doctors' instructions. The court also denied Gabriella's cross-petition for an order allowing contact.

Herren has appealed the restraining order against her, but Gabriella does not seek review of the order denying her cross-petition.

### DISCUSSION

Before proceeding, we note the restraining order in this case was set to expire on January 17, 2025. Neither party has addressed the issue of mootness in their briefs, and we exercise our discretion to consider the merits, as there may be a recurrence of controversy between the parties. (*In re D.P.* (2023) 14 Cal.5th 266, 282.)

### A. Authority to Seek Court Relief

Citing the Due Process in Competence Determinations Act (Stats. 1995, ch. 842, §§ 2, 3, as amended by Stats. 1997, ch. 581, §§ 19, 20), Herren

12

contends Susannah had no authority or standing to seek a restraining order under the Elder Abuse Act without first rebutting the presumption that George had capacity to make decisions such as retaining Herren. Relatedly, she argues the trial court was powerless to consider the restraining order request without first adjudicating George's competence.

In so contending, Herren relies principally on Probate Code sections 810 and 811. Probate Code section 810, subdivision (a), provides: "For purposes of this part, there shall exist a rebuttable presumption affecting the burden of proof that all persons have the capacity to make decisions and to be responsible for their acts or decisions." In turn, Probate Code section 811 expressly contemplates that a determination of a person's unsound mind or incapacity to make a decision, "including, but not limited to, the incapacity to contract . . . shall be supported by evidence of a deficit in at least one of the following mental functions [(alertness and attention, information processing, thought processes, ability to modulate mood and affect)], . . . and evidence of a correlation between the deficit or deficits and the decision or acts in question." Probate Code section 811 further provides: "The mere diagnosis of a mental or physical disorder shall not be sufficient in and of itself to support a determination that a person is of unsound mind or lacks the capacity to do a certain act."

Additionally, noting that George's trust permits George to petition a court to adjudicate his competence and requires a trustee to cooperate with any such petition, Herren argues Susannah could not unilaterally exercise her authority as attorney-in-fact to reject Herren's engagement and accuse Herren of elder abuse. Thus, in Herren's view, both the law and the terms of the trust call for Susannah to "first to carry the burden to rebut the presumption that George had capacity to engage Herren."

13

These arguments raise questions of law and statutory interpretation that we review de novo. (*In re Dezi* (2024) 16 Cal.5th 1112, 1128.)

Initially, we observe Herren's counsel agreed several times that the trial court would not be deciding George's capacity in the restraining order proceeding. Herren has thus forfeited this issue. (See *In re Marriage of Broderick* (1989) 209 Cal.App.3d 489, 501 ["an appellant waives his right to attack error by expressly or implicitly agreeing or acquiescing at trial to the ruling or procedure objected to on appeal"].)[3]

In any event, Herren cites no authority indicating that Susannah was required to rebut a presumption of George's capacity in order to have authority or standing to request a restraining order pursuant to section 15657.03 of the Elder Abuse Act, or that the trial court was required to determine George's capacity before adjudicating the restraining order application.

We start with the terms of the Elder Abuse Act. The act explicitly provides that " [*a*] *petition may be brought on behalf of an abused elder or dependent adult by* a conservator or *a trustee of the elder or dependent adult, an attorney-in-fact of an elder or dependent adult who acts within the authority of a power of attorney,* a person appointed as a guardian ad litem for the elder or dependent adult, or *other person legally authorized to seek the relief.*" (§ 15657.03, subd. (a)(2)(A), italics added.) As relevant here, an abused elder includes an elder who is financially abused (§ 15610.07), such as

---

[3]      At times, Herren's counsel also argued to the trial court that George's capacity could not be determined in the proceeding because George was not present. At one point, Herren's counsel indicated he was contemplating subpoenaing George, but then Webb indicated he was agreeable to coming up with an accommodation so that George could be heard, but the topic was never brought up again. Herren's failure to pursue this accommodation further supports the finding of a forfeiture.

in situations where a property right is obtained from an elder by undue influence.  (§ 15610.30, subd. (a)(3).)

The Elder Abuse Act then defines " '[u]ndue influence' " as meaning "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity."  (§ 15610.70, subd. (a).)  By its terms, the act contains no language suggesting that Probate Code section 810's presumption of capacity must be rebutted before a trustee or an attorney-in-fact may seek protection of an elder from this type of abuse.

Importantly, however, the act does require trial courts to consider the following four factors in determining whether undue influence produced an inappropriate result:  (1) the victim's vulnerability; (2) the influencer's apparent authority; (3) the influencer's actions or tactics; and (4) the equity of the result.  (§ 15610.70, subd. (a)(1)–(4).)  As to the first factor, evidence of the alleged victim's vulnerability "*may include*, but is not limited to, *incapacity*, illness, disability, injury, age, . . . impaired cognitive function, emotional distress, isolation, or dependency, and whether the influencer knew or should have known of the alleged victim's vulnerability." (§ 15610.70, subd. (a)(1), italics added.)  Notably, section 15610.70's express contemplation that evidence of an alleged elder victim's vulnerability "may include" evidence of "incapacity" to show the elder's susceptibility to undue influence appears to undercut Herren's contention that a petitioner must establish a victim's lack of capacity as a prerequisite to seeking an order protecting the elder from financial abuse under section 15610.30, subdivision (a)(3).

Indeed, to promote its goal of protecting vulnerable persons such as George, the Elder Abuse Act includes the following legislative declarations: "elders and dependent adults may be subjected to abuse, neglect, or

15

abandonment and . . . this state has a responsibility to protect these persons"; "mental and verbal limitations often leave them vulnerable to abuse and incapable of asking for help and protection"; and "infirm elderly persons and dependent adults are a disadvantaged class, [such] that cases of abuse of these persons are seldom prosecuted as criminal matters, and few civil cases are brought in connection with this abuse due to problems of proof, court delays, and the lack of incentives to prosecute these suits." (§ 15600, subds. (a), (c), (h).) In this regard, the Legislature was explicit in its intent "to enable *interested persons* to engage attorneys to take up the cause of abused elderly persons and dependent adults." (§ 15600, subd. (j), italics added.) "This statement of legislative intent suggests the Legislature intended a broad definition of standing in the context of elder abuse cases." (*Estate of Lowrie* (2004) 118 Cal.App.4th 220, 227 (*Lowrie*).)

Not only does Herren's proposal to require an adjudication of capacity appear contrary to the language of the Elder Abuse Act, but it would discourage restraining order applications for elders who are not incapacitated but are nonetheless vulnerable to abuse, which appears contrary to the Legislature's intent to broadly allow standing in elder abuse cases. As one court reasoned, "[s]tanding, for purposes of the Elder Abuse Act, must be analyzed in a manner" that protects "the victimized" and "induces interested persons to report elder abuse and to file lawsuits against elder abuse and neglect." (*Lowrie, supra*, 118 Cal.App.4th at p. 230.) Here, it was undisputed that Susannah is George's trustee and his attorney-in-fact with the power to prosecute legal actions involving George. Thus, we conclude that Susannah had standing to seek and obtain a protective order on behalf of George without an adjudication of his capacity.

16

Our conclusion that a restraining order may be sought and issued without a capacity determination is consistent with the principle that an elder's capacity is not a general defense to abuse under the Elder Abuse Act. Longstanding case law recognizes, for example, that "[s]oundness of mind and body does not imply immunity from undue influence. It may require greater ingenuity to unduly influence a person of sound mind and body, and more evidence may be required to show that such a person was overcome than in the case of one weak of body and mind. But history and experience teach that minds of strong men and women have often been overborne." (*In re Estate of Olson* (1912) 19 Cal.App. 379, 386; see American Bar Association's Commission on Law and Aging & American Psychological Association, Assessment of Older Adults with Diminished Capacities (2d ed. 2021), p. 25 ["[u]ndue influence is a separate issue from capacity," though diminished capacity or vulnerability (e.g., illness or stressful circumstances) are risk factors for undue influence].)

In sum, we reject Herren's contentions that the restraining order could not be sought or issued without the trial court first adjudicating George's competence.[4]

_____

[4] At oral argument, Herren seemed to abandon these contentions. Instead, she claimed for the first time that in cases such as this—where an elder allegedly enters an attorney-client relationship and executes an agreement for attorney fees—trial courts need not determine the elder's capacity but must ascertain whether a valid attorney-client relationship was formed. Setting aside Herren's apparent forfeiture of this belatedly-raised contention (see *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785), we note this new proposal does not seem materially different or any more meritorious than her argument that courts must make a threshold determination of the elder's capacity, at least in the circumstances of this case. Specifically, determining whether a valid attorney-client relationship was formed would likewise entail an examination of whether Herren exerted

## B. Substantial Evidence

Herren next argues there is no substantial evidence she engaged in any conduct that qualifies as elder abuse. We cannot agree.

Under the Elder Abuse Act, an elder is any adult residing in state who is 65 years or older. (§ 15610.27.) " 'Abuse of an elder' " includes "[p]hysical abuse . . . or other treatment with resulting physical harm or pain or mental suffering" (§ 15610.07, subd. (a)(1); see § 15657.03, subd. (b)(1)), as well as "[f]inancial abuse," which includes situations where a person "[t]akes," "obtains," or assists in taking or obtaining "real or personal property of an elder or dependent adult by undue influence." (§§ 15610.07, subd. (a)(3), 15610.30, subd. (a)(3).) Such abuse may be found "when an elder or dependent adult is deprived of *any property right, including by means of an agreement . . . , regardless of whether the property is held directly or by a representative of an elder or dependent adult*." (§ 15610.30, subd. (c), italics added.) A " 'representative' " includes a trustee, attorney-in-fact, or other representative of the estate of an elder. (§ 15610.30, subd. (d).)

When a trustee or an attorney-in-fact brings a petition on behalf of an elder (§ 15657.03, subd. (a)(2)(A)), a protective order may be issued, "with or without notice, to restrain any person for the purpose of preventing a recurrence of abuse, if a declaration shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse" of the elder (§ 15657.03,

---

undue influence on George to secure her right to represent him and his agreement to pay for her representation. As recounted above, and in part B, *post*, the record establishes that George's two doctors had declared him incompetent to make financial decisions, and George does not know who Herren is, does not recall meeting with her or their discussions, and does not want to pay Herren's $100,000 retainer. Meanwhile, Herren contends she is not at liberty to discuss her conversation with George because of the attorney-client privilege.

18

subd. (c)).  Further, upon notice and a hearing, a court may issue any of the statutorily enumerated restraining orders, including orders "enjoining a party from abusing, . . . harassing, telephoning, . . . contacting, either directly or indirectly, by mail or otherwise, or coming within a specified distance of, or disturbing the peace of," the elder.  (§ 15657.03, subds. (b)(5)(A), (h).)

"[P]rotective orders under the Elder Abuse Act require proof by a preponderance of the evidence of a past act or acts of elder abuse."  (*Bookout v. Nielsen* (2007) 155 Cal.App.4th 1131, 1134.)  Elder abuse protective orders are reviewed for abuse of discretion, and the factual findings necessary to support such orders are reviewed for substantial evidence.  (*Id.* at p. 1137.)  Under the substantial evidence test, " '[w]e resolve all conflicts in the evidence in favor of respondent, the prevailing party, and indulge all legitimate and reasonable inferences in favor of upholding the trial court's findings.' [Citations.]  . . . [T]he testimony of even one witness may support a finding based thereon."  (*Newman v. Casey* (2024) 99 Cal.App.5th 359, 375.)

Having reviewed the entire record, we conclude substantial evidence supports the trial court's finding that Herren committed elder financial abuse by exerting undue influence to obtain a property right from George. (§ 15610.30, subd. (a)(3).)

First of all, it is undisputed that George is an elder and that Herren obtained George's agreement to pay a $100,000 retainer.  Such an agreement is a property right, as evidenced by Herren's demand for payment.  As one court explains, "The concept of property in California is extremely broad. ' "The term 'property' is sufficiently comprehensive to include every species of estate, real and personal, and everything which one person can own and transfer to another.  It extends to every species of right and interest capable of being enjoyed as such upon which it is practicable to place a money

19

value." ' " (*Estate of Sigourney* (2001) 93 Cal.App.4th 593, 603; see, e.g., *In re Marriage of Brown* (1976) 15 Cal.3d 838, 845 [a contractual right is "a chose in action, a form of property"]; *Mahan v. Charles W. Chan Ins. Agency, Inc.* (2017) 14 Cal.App.5th 841, 861, 853–854, 864 [deprivation of a property right under section 15610.30 implicated where respondents allegedly restructured insurance policies held by plaintiffs' trust with increased premiums that required payment by plaintiffs]; *Bounds v. Superior Court* (2014) 229 Cal.App.4th 468, 472, 479–480 (*Bounds*) [same conclusion where allegations showed that elderly petitioner executed escrow instructions authorizing the sale of real property owned by her trust, even though escrow was later cancelled and title and possession of the property were not transferred].)

The record also contains substantial evidence establishing that Herren obtained this property right by undue influence. As to the first factor relevant to this determination, evidence of the alleged victim's vulnerability "may include, but is not limited to, incapacity, illness, disability, injury, age, . . . impaired cognitive function, emotional distress, isolation, or dependency, and whether the influencer knew or should have known of the alleged victim's vulnerability." (§ 15610.70, subd. (a)(1).)

Here, George was 86 years old when he met with Herren. Just a few years prior, at the end of a romantic relationship, George's mental health and mood became erratic; he was sad, anxious, suicidal and scared "all the time." Physically, he was unstable and weak. In February 2023, George's treating doctors declared their professional judgment that he lacked capacity to make medical and financial decisions. By May 2024, George's health had improved, but he still experienced anxiety and depression, macular degeneration such that he is legally blind, and severe and progressive dementia. The testimony established that, on a daily basis, he is unable to remember that he is at his

20

home and that he has children and was formerly married. Similarly, he does not know if he has a girlfriend or if his parents are still alive, and he cannot remember his long-time caregiver's name. Moreover, he is not oriented to time and his short-term memory is "almost gone." Other evidence of vulnerability included testimony that George is lonely and desires companionship, and multiple witnesses testified that conversations about money and finances distress him.

As for the second factor in determining whether undue influence has been exercised, courts assess the influencer's "apparent authority." (§ 15610.70, subd. (a)(2).) Evidence of such authority "may include, but is not limited to, status as a fiduciary, family member, care provider, health care professional, legal professional, spiritual adviser, expert, or other qualification." (*Ibid*.) Here, there is no question that Herren is a lawyer, and that Gabriella introduced her to George as such. According to Moore, Herren demanded, in George's presence, to be alone with George and threatened Moore with a charge of elder abuse. Conversely, Herren testified she told Moore to leave in George's presence and said " 'this is going to be an attorney-client privileged conversation that you can't listen in on.' " Either way, George evidently witnessed Herren's assertion of authority as a legal professional.

As for the third factor, evidence of the influencer's actions or tactics "may include, but is not limited to, all of the following: [¶] (A) Controlling . . . the victim's interactions with others . . . . [¶] (B) Use of affection, intimidation, or coercion. [¶] (C) Initiation of changes in personal or property rights, use of haste or secrecy in effecting those changes, effecting changes at inappropriate times and places, and claims of expertise in effecting changes." (§ 15610.70, subd. (a)(3).) In this case, Herren knew that George had a trust

21

and that Susannah was a co-trustee, yet she met with George while Susannah was out of town. Herren also knew two medical professionals had found that George lacked capacity to make medical and financial decisions. Aside from asking Gabriella for a copy of the trustee notification, Herren intentionally refrained from asking anyone, including Gabriella, for any other information. Herren's visit was not on George's calendar, and when Herren informed Moore during his visit with George that George knew her and had set up the appointment, George said he did not know Herren or her name. Nor did George indicate he wanted to meet with Herren.

Additionally, despite Moore's protests, Herren got George alone by threatening Moore in front of George with being " 'charged with elder abuse.' " Once alone, the two spoke privately for up to an hour and a half. At the end of that meeting, Herren procured George's signature on a retainer agreement that she brought with her. George has macular degeneration and is legally blind. Notably, Herren did not read George the entire attorney fee agreement; she only read him the first two pages and summarized other parts, including the billing terms. George signed it, but Herren had to point to the place for him to sign. Moore's testimony also established that, after the meeting, George looked drained, hungry, and tired. Furthermore, when Susannah asked George a few days later if he wanted to pay Herren's invoice for $100,000, George said he had never met Herren and was appalled someone would ask him for that amount of money.

Finally, the fourth factor pertaining to the equity of the result contemplates the court's consideration of evidence that "may include, but is not limited to, the economic consequences to the victim, any divergence from the victim's prior intent or course of conduct or dealing, the relationship of the value conveyed to the value of any services or consideration received, or

22

the appropriateness of the change in light of the length and nature of the relationship." (§ 15610.70, subd. (a)(4).)

Here, George's trust names Susannah as a successor co-trustee in the event of his incapacity, and it defines incapacity to include when a "medical doctor" or "the Settlor's treating physician" examines the elder "and declares under penalty of perjury that such person is either temporarily or permanently incapacitated . . . ." George's DPOA also names Susannah as a successor attorney-in-fact, specifically giving her broad power to litigate on his behalf and in any matters involving him. Thus, contrary to Herren's contentions, the purported hiring of Herren to explore filing a petition to challenge the diagnosis of George's incompetence represents a complete divergence from George's intent as expressed in his trust and DPOA, which were executed before his treating doctors authored letters stating he lacked capacity.

In arguing that substantial evidence does not support the finding of elder abuse, Herren contends that she "simply met with a putative client to assess an engagement for a purpose authorized in a trust," and that she "did not coax George to sell real estate or other property to her" but "merely allowed George to express his concerns to her and concluded he was within his rights to petition a court." "As a matter of law," she argues, "that is not elder abuse." Several amici curiae characterize this case in the same manner and suggest affirmance of the instant restraining order would imply that an attorney commits elder abuse "simply by meeting alone with the client."

Herren's and amici's concerns are off the mark. This is not a situation in which a finding of elder financial abuse is predicated on the mere circumstance that an attorney met with a putative client who has diminished capacity. Rather, as discussed, the record contains ample evidence Herren

committed financial abuse by exerting undue influence in meeting with George alone to secure his consent to legal representation and a $100,000 retainer fee, even though she knew he had been declared incompetent by two medical professionals. Our conclusion fully comports with the Legislature's contemplation that the propriety of issuing an elder abuse restraining order calls for the evaluation of evidence on a case-by-case basis. And while we acknowledge that other cases with different facts may present the potential for tension between the interest in allowing attorneys to meet with and represent elderly people with diminished capacity, and the interest in protecting elders against the types of abusive conduct set out in the Elder Abuse Act, we are confident in the ability of trial courts to carefully scrutinize the evidence presented by all sides in evaluating whether an attorney has crossed the line in securing fee agreements and other rights from an elder.

In sum, substantial evidence supports the trial court's findings of undue influence and elder abuse.

### C. Other Contentions

Herren makes a number of additional contentions in challenging the restraining order. None is availing.

For example, Herren contends Gabriella told her that a court had terminated a conservatorship over George, meaning there had been a finding that George could make his own decisions. But the record reflects Herren knew from the trustee notification provided by Gabriella before the meeting with George that the trust was deemed irrevocable and that Susannah was a co-trustee because George had been declared incapacitated.

Herren next argues that because she sent the retainer agreement to Susannah's counsel, the Stimmel firm, Herren "would only obtain property if an independent fiduciary (or a court) approved the engagement," and so she

did not "wrongfully deprive George of property." Herren relatedly contends her presentation of the agreement to Susannah "precluded a finding of an intent to defraud or undue influence." But Herren cites no authority to support this proposition, and it is contrary to case law (e.g., *Bounds*, *supra*, 229 Cal.App.4th at pp. 472–473 [" 'taking' " for purposes of financial abuse under the Elder Abuse Act occurs when an elder entered "an unconsummated agreement which, in effect, significantly impairs the value of the elder's property"]), and to section 15610.30, subdivision (c), which provides that "a person or entity takes, . . . obtains, or retains . . . personal property when an elder or dependent adult is deprived of any property right, *including by means of an agreement, . . . regardless of whether the property is held directly or by a representative of an elder or dependent adult.*" (Italics added.)

Herren also contends the restraining order must be reversed "on the independent ground that there was (and is) no substantial evidence of a prospective threat." This argument, however, is unaccompanied by record citations or citations to authority and so is forfeited. (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 557 (*Yield Dynamics*).) Indeed, it appears contrary to the record, which reflects that Herren intends to pursue representing George and will seek a court order for payment of the retainer. Moreover, and in any event, "a protective order under the Elder Abuse Act may issue on the basis of evidence of past abuse, without any particularized showing that the wrongful acts will be continued or repeated." (*Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 137; § 15657.03, subd. (c).)

Herren additionally contends the State Bar of California's Standing Committee on Professional Responsibility and Conduct formal opinion No. 2021-207 (State Bar Opinion) suggests that her conduct "is what an attorney should do with regard to a putative client who had diminished capacity." To

the extent Herren is relying on the State Bar Opinion to challenge the trial court's determination that she obtained a property right from George by undue influence, we reject this. The court heard the evidence, and it is not our role to reweigh it. Nor are we persuaded that the State Bar Opinion indicates Herren's conduct does not constitute elder abuse as a matter of law; the State Bar Opinion does not directly address the facts of this case, much less validate her conduct as a matter of law.

In sum, substantial evidence supports the trial court's determination that Herren engaged in conduct that qualifies as elder financial abuse under subdivision (a)(3) of section 15610.30.[5]

### D. Conflict of Interest and Due Process Arguments

Herren sets out a series of arguments under the heading the trial court should never have "allowed the elder abuse action against Herren in light of the profound conflicts of interest and other due process problems inherent in such a proceeding." (Capitalization and bold omitted.) We address these in turn.

First, Herren argues the instant restraining order action deprived George of his civil rights without due process. This is so, she claims, because "*George asked Herren to petition a court* to remove [Susannah] as trustee and *to adjudicate his capacity*, yet the elder abuse action prevented the trial court

---

[5] Given our conclusion, we need not and do not address Herren's contention that the evidence was insufficient to establish her commission of any physical abuse of George, or George's contention and the trial court's apparent finding that Herren also engaged in financial abuse under subdivisions (a)(1) and (a)(2) of section 15610.30.

We likewise do not address other lurking and unsupported arguments in Herren's opening brief, such as her contention that Susannah's action was an "unnecessary overreaction" because Susannah could have petitioned the court to decide whether George was competent to retain Herren.

26

from adjudicating any such petition, nor even determining George's capacity. In other words, by abusing her power as George's agent to sue Herren, [Susannah] silenced *George's expressed wish to petition the court*—without the court ever hearing from George or affording him any due process." (Italics omitted and added.)

This argument is unsupported by record citations or citations to authority, and so it is forfeited. (*Yield Dynamics*, *supra*, 154 Cal.App.4th at p. 557.) It is also unpersuasive. The premise of the claim that George asked Herren "to petition a court to remove [Susannah] as trustee and to adjudicate his capacity" is contradicted by Herren's own testimony that George did not authorize her to file anything regarding his competency; instead, what George wanted was a second meeting, and "the extent of [her] authority was [to] ask for the next meeting."

Second, Herren claims this action "blessed an attorney conflict" because Webb filed this action in George's name while simultaneously representing Susannah, which was impermissible because George and Susannah had conflicting interests. Apart from cursorily suggesting Webb had a conflict, Herren never formally moved to have Webb disqualified nor pursued or obtained a ruling as to whether Webb had a conflict. The issue was thus forfeited. (*In re Candida S.* (1992) 7 Cal.App.4th 1240, 1253, fn. 8 [meaningful appellate review can only occur if a party raises a potential conflict of interest, the trial court hears the matter, and the trial court decides whether an actual conflict exists]; see generally *People v. Braxton* (2004) 34 Cal.4th 798, 813–814 [failure to press for a ruling results in forfeiture of issue on appeal].)

Citing *Kennedy v. Eldridge* (2011) 201 Cal.App.4th 1197 (*Kennedy*), Herren appears to suggest Webb should have been disqualified sua sponte,

27

despite her failure to seek his disqualification. We are unpersuaded. *Kennedy* involved support and custody of an infant where the trial court granted the mother's motion to disqualify the child's paternal grandfather, Richard, from representing the father. (*Kennedy*, at p. 1200.) *Kennedy* affirmed, concluding that "where an attorney's continued representation threatens an opposing litigant with cognizable injury or would undermine the integrity of the judicial process, the trial court may grant a motion for disqualification, regardless of whether a motion is brought by a present or former client of recused counsel." (*Id*. at pp. 1204–1205.)

Though *Kennedy* indicates a trial court may grant a nonclient's motion to disqualify counsel, it does not purport to hold that a trial court has a sua sponte duty to disqualify counsel, nor does *Kennedy* set out the parameters of what might trigger such a sua sponte duty.

Third, Herren argues the action "endorsed fiduciary self-dealing" because George "retained Herren to petition a court to remove [Susannah] as trustee," and therefore Susannah had a direct conflict with George's retention of Herren and any proposed petition concerning George's competency. Again, this does not appear to have been raised below. Further, as already discussed, this too rests on the false premise that Herren was hired to file a petition adjudicating George's competency.

Fourth, Herren contends: "The elder abuse statute also should not be read to proscribe [her] conduct because any such statutory interpretation would be at odds with other legal principles and their underlying public policy." Herren urges us to harmonize the Elder Abuse Act with other laws that protect the right to petition a court—namely, the anti-SLAPP statute and litigation privilege—and conclude her conduct does not constitute elder abuse. This argument was never raised below. Herren never filed a special

28

motion to strike under anti-SLAPP statute nor raised the litigation privilege. We deem the claim forfeited. (*Yield Dynamics*, *supra*, 154 Cal.App.4th at p. 557.)

Next, Herren contends the proceeding was fundamentally unfair to her because the "attorney-client privilege precluded her from testifying to the contents of her conversation with George." We decline to consider this contention because not only did Herren fail to raise this issue below, but her argument on appeal consists solely of one conclusory sentence and a citation to *Qualcomm Inc. v. Broadcom Corp.* (S.D.Cal. Mar. 5, 2008, No. 05CV1958-RMR (BLM)), 2008 U.S. Dist. Lexis 16897 without any discussion of how that opinion applies to the case at hand.

Herren's brief sets out additional arguments under the heading stating that Susannah's "elder abuse action should not be allowed because it would permit malevolent trustees to engage in elder abuse without due process." (Capitalization and bold omitted.) In Herren's view, the "potential for abuse in this situation is apparent because no one independent of [Susannah] had access to George, and the court relied only on [Susannah's] account, without due process safeguards." Setting aside the lack of authority for these arguments, her premise that "no one independent of [Susannah] had access to George" is untrue. Apart from Susannah, various people had access to George both before and after Herren's visit, including caregiver Moore, Dr. Sutherland, and Gabriella, all of whom testified at the evidentiary hearing.

Finally, Herren posits a hypothetical—that a malevolent trustee might commit financial elder abuse then use an elder abuse restraining order action to "silence the settlor and disable [their] counsel"—as an illustration why the trial court thus should not have allowed the action to proceed. But the

29

hypothetical is incongruent with the evidence in this case, and it does not compel a different outcome.

In conclusion, we reiterate that the Legislature enacted the Elder Abuse Act with the intent to broadly protect vulnerable elders, and that trial courts must decide what constitutes elder abuse on a case-by-case basis.

### DISPOSITION

The order is affirmed.  George is entitled to recover costs on appeal.


FUJISAKI, P. J.


WE CONCUR:


PETROU, J.

RODRÍGUEZ, J.

Trial Court:        Marin County Superior Court

Trial Judge:        Hon. Simon J. Frankel*

Counsel:           Reed Smith and Raymond A. Cardozo for Defendant and
                     Appellant

                     Webb Legal Group and William T. Webb for Plaintiffs and
                     Respondents

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.